**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

| | |
|---|---|
| AC&R INSULATION CO., INC., | * |
| Plaintiff/Counter-Defendant, | * |
| v. | * |
| | * Civil Case No.: PWG-12-3528 |
| PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE CO. | * |
| | * |
| Defendant/Counter-Plaintiff. | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This Memorandum Opinion disposes of:

(1) Plaintiff and Counter-Defendant AC&R Insulation Co, Inc.'s ("AC&R") Motion for Leave to File Second Amended Complaint ("Pl.'s Mot. to Am."), ECF No. 27, and supporting Memorandum ("Pl.'s Am. Mem."), ECF No. 27-1; Defendant and Counter-Plaintiff Pennsylvania Manufacturers' Association Insurance Co.'s ("PMA") Opposition ("Def.'s Am. Opp'n"), ECF No. 27-2; and AC&R's Reply ("Pl.'s Am. Reply), ECF No. 29-1; and

(2) AC&R's Motion for Summary Judgment ("Pl.'s Summ. J. Mot."), ECF No. 34, and supporting Memorandum ("Pl.'s Summ. J. Mem."), ECF No. 34-1; PMA's Cross-Motion for Summary Judgment ("Def.'s Cross-Mot."), ECF No. 38, and Memorandum in Opposition to Plaintiff's Summary Judgment Motion and in support of Defendant's Cross-Motion ("Def.'s Cross-Mot. Mem."), ECF No. 40; AC&R's

Reply and Opposition ("Pl.'s Summ. J. Reply"), ECF No. 42; and PMA's Reply ("Def.'s Summ. J. Reply"), ECF No. 43.

Having reviewed the filings, I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the reasons stated herein, AC&R's Motion to Amend is DENIED. AC&R's Summary Judgment Motion also is DENIED, and PMA's Cross-Motion for Summary Judgment is GRANTED.

## I. FACTUAL BACKGROUND

In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the non-movant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004). Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Unless otherwise stated, this background is composed of undisputed facts. *See Ricci*, 557 U.S. at 585–86; *George & Co.*, 575 F.3d at 391-92; *Dean*, 336 F. Supp. 2d at 480.

Plaintiff AC&R is a Delaware Corporation with its principal place of business in Howard County, Maryland. Stipulation of Facts ("Stip.") ¶ 17, ECF No. 33. AC&R has been in existence for several decades, first under the name "Asbestos Covering and Roofing" and, after 1978, under its current name, Cameron Dep. 14:9–13, Stip. Ex. 3, ECF No. 33-3, and "is in the business of selling insulation products to plumbing, heating and insulation contractors and other customers." Stip. ¶ 22. Prior to 1972, AC&R distributed certain products that contained asbestos, *id.* ¶ 24, and as a result, has been named as a defendant in hundreds of asbestos-related lawsuits ("Asbestos Suits"), *id.* at ¶ 28. Defendant PMA is an insurance company organized

under the laws of Pennsylvania and with its primary place of business in Pennsylvania, licensed to do business in Maryland. *Id.* ¶¶ 15–16.

This lawsuit revolves around two insurance policies—a primary liability policy and an umbrella policy—covering a term from September 1, 1986 to September 1, 1987. *See generally* Stip. Because this lawsuit relates to events that took place over a quarter-century ago, the evidence presented by the parties on summary judgment necessarily has been limited. Walter Shipe, who served as Plaintiff's Vice President at all times relevant to this suit, was "medically unable to testify" during discovery, Kerns Aff. ¶ 14, Def.'s Cross-Mot. Mem. Ex. P, ECF No. 38-18, and since has died, Cameron Dep. 10:15–17. Richard H. Malat, who served as AC&R's insurance broker at Marsh & McLennan, Inc. ("Marsh"), died in August 2012. Kerns Aff. ¶ 9. Richard Chaney, the PMA Account Executive who handled AC&R's account during the relevant period "could no longer remember any information about AC&R" when questioned. *Id.* ¶ 5. Several other employees of AC&R, PMA, and Marsh also were unable to recall any significant details about AC&R's policies with PMA in the 1980s. *See id.* ¶¶ 3–4, 6–8, 10–13.

Further, there is a paucity of documents memorializing the events of 1986 and 1987. Marsh has been unable to locate any documents pertaining to AC&R. Stip. ¶ 51. PMA had destroyed many of its relevant documents pursuant to its routine Corporate Records Retention Policy. Hamilton-Little Aff. ¶ 10, Def.'s Cross-Mot. Mem. Ex. O, ECF No. 38-17; *see also* PMA Corporate Records Retention Policy (the "PMA Records Policy"), Def.'s Cross-Mot. Mem. Ex. Q, ECF No. 38-19 (setting document destruction dates). Virginia Cameron, AC&R's Rule 30(b)(6) designee and Shipe's daughter, testified that her father typically did not write letters but rather conducted his correspondence on the telephone, and occasionally would "write notes on the sides of things." Cameron Dep. 29:4 – 30:4. Although a number of documents and

3

correspondence were located in AC&R's files, *id.* at 11:2 – 13:10, there are significant gaps in the record. However, the documents that were located, as well as the uncontroverted or stipulated facts, demonstrate the following events.

Beginning in 1985, Marsh & McLennan, Inc., served as AC&R's insurance broker in connection with its purchase of insurance policies from PMA. In 1985, AC&R purchased two relevant policies from PMA: policy number 828500-00-07-61-7W, a primary liability policy effective September 1, 1985 to September 1, 1986, with a policy limit of $500,000 (the "1985 Primary Policy"), *id.* ¶ 2.a(1), and policy number 608500-00-07-61-7, an "umbrella" policy effective for the same period with a policy limit of $1 million (the "1985 Umbrella Policy" and, together with the 1985 Primary Policy, the "1985 Policies")), *id.* ¶ 2.a(2). It is not disputed that the 1985 Policies cover AC&R's liability with respect to Asbestos Suits.

In 1986, AC&R sought to renew its coverage, as evidenced by a September 2, 1986 letter from Malat to Shipe stating that PMA was finalizing a renewal offer and, pending resolution of Marsh's discussions with PMA, "we have bound coverage for the exposures under consideration." Sept. 2, 1986 Letter, Stip. Ex. 6, ECF No. 33-6. Malat also indicated that he "had made submissions to other markets but [was] unable to develop a strong interest in the [AC&R] account." *Id.*[1] Attached to the letter was an Insurance Binder (the "Binder"), bearing the binder number 1069. Binder 1, Stip. Ex. 17, ECF No. 33-17. The Binder was a one-page, two-sided document setting forth terms that included primary liability coverage of $500,000 and

---

[1] Because these letters are dated more than twenty years ago and their authenticity has not been questioned, the statements contained therein are admissible for their substance as "Statements in Ancient Documents." Fed. R. Evid. 803(16).

4

"Excess Umbrella" coverage of $2 million. *Id.*[2] At the top, the Binder contained the text: "THIS BINDER IS A TEMPORARY INSURANCE CONTRACT SUBJECT TO THE CONDITIONS SHOWN ON THE REVERSE SIDE OF THIS FORM." *Id.* The reverse contained, *inter alia*, a statement that "[t]his insurance is subject to the terms, conditions and limitations of the policy(ies) in current use by [PMA]," and "[t]his binder is cancelled when replaced by a policy." *Id.* at 2.

On September 10, 1986, Malat sent Shipe a letter regarding Marsh's negotiations with PMA over AC&R's insurance policy. Sept. 10, 1986 Letter 1, Stip. Ex. 5, ECF No. 33-5. Malat's letter noted that PMA's quote included "substantial" increases, but opined that these increases were "equitable and reflect[ed] a desire to continue as AC&R's insurer." *Id.* at 2. Included with the September 10 letter was an Insurance Binder (the "Revised Binder"), bearing the binder number "1069 Revised." Revised Binder 1, Stip. Ex. 18, ECF No. 33-18. The Revised Binder consisted of two double-sided pages and set forth terms including primary liability coverage of $500,000 and excess umbrella coverage of $2 million. *Id.* The Revised Binder had the same text on the top and on the reverse as the original Binder. Revised Binder.

An October 10, 1986 letter from Malat to Shipe further discussed the cost of AC&R's new insurance coverage, including the fact that AC&R was considering foregoing certain coverage to save money:

> While we agree the cost of this coverage may appear excessive, the unpredictable trends of U.S. courts, particularly in the area of products liability, make any future loss prediction nothing more than a guess. As expensive as this coverage may be, we continue to recommend that A.C.& R. purchase Products/ Completed Operations coverages.

---

[2] Although Plaintiff initially had taken the position that the copies of the Binders that it received were one-sided only, Plaintiff's counsel since learned that Plaintiff had received two-sided versions of the Binders and has revised its position accordingly. *See* Notice, ECF No. 36.

5

Oct. 10, 1986 Letter 1, Stip. Ex. 7, ECF No.33-7.

Following a few additional letters, Malat sent Shipe a letter dated December 2, 1986 that stated that PMA had been instructed to include Products/Completed Operations coverage. Dec. 2, 1986 Letter 1, Stip. Ex. 10, ECF No. 33-10. A letter sent on December 11, 1986 noted that the Binder "was issued for a 60-day term" that had expired while Marsh waited "until an analysis of options had been completed at various levels including [AC&R's] legal counsel." Dec. 11, 1986 Letter 1, Stip. Ex. 11, ECF No. 33-11. As a result, Malat attached another Insurance Binder, bearing binder number "1069 Extended" (the "Extended Binder" and, together with the "Binder" and the "Revised Binder," the "Binders"), another two-page, double-sided document setting forth insurance terms and including the same language as the previous Binders on the top and the reverse. Extended Binder, Stip. Ex. 19, ECF No. 33-19.

On February 17, 1987, Malat sent Shipe a letter purporting to respond to an earlier letter from Shipe and "apologiz[ing] if [Marsh] appeared inattentive to [AC&R's] account." Feb. 17, 1987 Letter 2, Stip. Ex. 12, ECF No. 33-12. In that letter, Malat noted, "While we hope to have the policy before the binder expires, this may not work out. However, please be assured changes in mid-term are not likely." *Id.* at 2.

The next letter provided by the parties is dated June 4, 1987, and begins, "My letter of February 20th forwarding the captioned policy noted some difference from what had been expected." June 4, 1987 Letter, Stip. Ex. 13, ECF No. 33-13. It goes on to say "that the policy as endorsed provides the coverage intended." *Id.* Another letter, also dated June 4, 1987, lists "numerous discrepancies which [Marsh] believed should be corrected before delivering the policy to [AC&R]." June 4, 1987 Discrepancy Letter, Stip. Ex. 14, ECF No. 33-14. The June 4

Discrepancy Letter did not list the existence of an asbestos exclusion among the discrepancies. *Id.*

The Binders were superseded by two policies: policy number 828600-00-07-61-7W, a primary liability policy that was effective September 1, 1986 to September 1, 1987, with a policy limit of $500,000 (the ("1986 Primary Policy"), Stip. ¶ 2.b(1), and policy number 608600-00-07-61-7, an umbrella policy effective for the same period with a policy limit of $1 million (the "1986 Umbrella Policy" and, together with the Primary Policy, the "1986 Policies")), *id.* ¶ 2.b(2). Unlike the 1985 Policies, and unlike the Binders, the 1986 Policies contained asbestos exclusions (the "Asbestos Exclusions"). The 1986 Primary Policy contained an "Asbestos Exclusion Endorsement" stating, *inter alia*, that the insurer would have no liability arising out of "goods or products composed in whole or in part of asbestos." 1986 Primary Policy 30, Stip. Ex. 1, ECF No. 33-1. It also contained an "Asbestos Exclusion Form C-630 (9/86) Notice of Reduction in Coverage," which stated "Since our reinsurers no longer will provide us with any asbestos coverage we must eliminate all asbestos coverage from your policy." *Id.* at 31.[3] The 1986 Umbrella Policy also contained an Asbestos Exclusion Endorsement. Umbrella Policy 17, Stip. Ex. 2, ECF No. 33-2.

It is undisputed that Shipe received the policy no later than June 1987. Cameron Dep. 61:1–12. Ms. Cameron was quite certain that Shipe had noticed the Asbestos Exclusions because "[h]e swore," *id.* at 61:17–19, and she was aware that Shipe had a discussion with Malat,

---

[3] AC&R has attempted to show that this statement was not actually true. Pl.'s Summ. J. Mem. 21. However, because AC&R has not alleged that it relied on PMA's statements regarding its reinsurers or even that the statement was intended to induce reliance, the coverage provided by PMA's reinsurance policies simply is immaterial. *See Gourdine v. Crews*, 955 A.2d 769, 791 (Md. 2008) (listing the elements for fraud).

7

but did not know what was said or whether his displeasure ever was conveyed to PMA. *Id.* at 61:22 – 64:11.[4]

There is no evidence in the record that Shipe ever objected directly to PMA or initiated any legal proceedings to clarify the effect of the Asbestos Exclusions. After the 1986 Policies, AC&R purchased insurance policies from PMA for every year until 1992; all of these policies contained Asbestos Exclusions. Stip. ¶¶ 2.c, 3.

Beginning in 1988, PMA, among other insurers, paid for the defense and indemnity of AC&R with respect to Asbestos Suits under the 1985 Primary Policy and, later, under the 1985 Umbrella Policy. Stip. ¶¶ 5–9. At that time, PMA repeatedly stated its position that "[t]he Asbestos exclusions . . . specifically excludes [*sic*] coverage under the 1987 and 1986 policies." Letter from PMA to AC&R 2 (Sept. 8, 1988), Def.'s Cross.-Mot. Mem. Ex. H, ECF No. 38-10; Letter from PMA to AC&R 2 (May 7, 1990), Def.'s Cross-Mot. Mem. Ex. I, ECF No. 38-11. There is no indication that AC&R objected to this position or took any action, legal or otherwise, to require PMA to provide coverage for Asbestos Suits under the 1986 Policies. As of June 13, 2013, PMA had exhausted coverage under the 1985 Primary Policy and nearly had exhausted coverage under the 1985 Umbrella Policy. Stip. ¶¶ 7–11.

AC&R filed its Complaint, ECF No. 1, in this Court on November 30, 2012. The Complaint sought declaratory judgment with respect to PMA's obligations under AC&R's insurance policies, claiming that "AC&R has made proper demand upon PMA to fulfill its

---

[4] PMA argues that evidence of Shipe's displeasure is inadmissible hearsay. Def.'s Reply Mem. 4. However, the fact that Shipe swore and "holler[ed]," Cameron Dep. 63:15, is admissible to show his state of mind rather than to prove the truth of any statements he may have uttered while swearing. Indeed, insofar as Cameron did not offer any testimony regarding the substance of what Shipe hollered, it is not possible to rely upon his statements for their truth. *See* Fed. R. Evid. 801(c)(2). If not offered for their truth, and if relevant to prove something other than their truth—such as state of mind—what was said cannot be hearsay.

contractual and legal obligations" and that "PMA has failed and refused to tender its excess/umbrella liability insurance policy benefits." Compl. ¶¶ 13–14. On February 11, 2013, PMA filed its answer and a counterclaim for declaratory judgment in its favor. Ans. & Countercl., ECF No. 5. On March 1, 2013, AC&R filed an Amended Complaint making some corrections and clarifying certain allegations. First Am. Compl., ECF No. 17.

On June 3, 2013, AC&R sought leave to amend its complaint further, Pl.'s Am. Mot., ECF No. 27, seeking to add factual allegations that the Binders received by AC&R were only one-sided and additional legal grounds for finding the Asbestos Exclusion invalid, *id.*[5] PMA opposed the motion on the grounds that AC&R lacked sufficient good cause and amendment would be futile. Def.'s Am. Opp'n. Plaintiff has filed its reply, Pl.'s Am. Reply, and that motion now is before me.

Subsequently, the parties have filed cross-motions for summary judgment, each seeking declaratory judgment in its own favor. *See* Pl.'s Summ. J. Mot.; Def.'s Cross-Mot. In essence, AC&R claims that the Binders committed PMA to provide insurance that did not include Asbestos Exclusions, and that the Asbestos Exclusions were a material change after the fact that was impermissible and inequitable. *See generally* Pl.'s Summ. J. Mot. The crux of Defendant's position is that the 1986 Policies, as issued, are the governing documents and that Plaintiff had notice of the Asbestos Exclusions when the policies were issued, if not before, and did not object to the Asbestos Exclusions at that time. Those motions have been briefed fully in accordance with the stipulation of the parties under Local Rule 105.2(c), *see* Stipulation Pursuant to Loc. R. 105(2)(c) Concerning Summ. J. Filings, ECF No. 31, and now are before me as well.

---

[5] In light of AC&R's discovery that it did, in fact, receive two-sided Binders, the status of AC&R's motion for leave to amend is not entirely clear. *See* Notice, ECF No. 36. However, I will assume that AC&R still seeks to amend its complaint regarding the other matters addressed in its motion.

Because a grant of summary judgment for either party may obviate the need to amend the complaint, I will consider the parties cross-motions for summary judgment first, and will turn to Plaintiff's Motion for Leave to Amend only if necessary.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). When considering cross-motions for summary judgment, the court must consider "each motion . . . individually" and view "the facts relevant to each . . . in the light favorable to the nonmovant." *Mellen*, 327 F.3d at 363. If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* "[U]nder Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form." *Mallik v. Sebelius*, ---- F. Supp. 2d ----, 2013 WL 4559516, at *12 (D. Md. Aug. 28, 2013) (citing *Niagara Transformer*

*Corp. v. Baldwin Techs., Inc.*, No. DKC-11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013)).

A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hoovan-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see* Fed. R. Evid. 401 (defining relevance).

## III. DISCUSSION

PMA has argued that AC&R's claims are barred by the applicable statute of limitations and by the equitable doctrine of laches. These two distinct, but related, doctrines protect a party from having to defend claims that are asserted so long after they have accrued that it would be unjust to defendants. "Statutes of limitations are designed primarily to assure fairness to defendants on the theory that claims, asserted after evidence is gone, memories have faded, and witnesses disappeared, are so stale as to be unjust." *Bertnoazzi v. Hillman*, 216 A.2d 723, 726 (Md. 1966). Laches "is a defense in equity against stale claims, and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *Parker v. Bd. of Election Supervisers*, 186 A.2d 195, 197 (Md. 1962).

### A. Statute of Limitations

In Maryland, the statute of limitations for civil actions is three years from the date of accrual. Md. Code Ann., Cts. & Jud. Proc. § 5-101. As Judge Moylan has observed, "[m]easuring three years is easy. Ascertaining the date on which the three-year measurement is

11

to begin is far from easy." *Commercial Union Ins. Co. v. Porter Hayden Co.*, 698 A.2d 1167, 1186 (Md. Ct. Spec. App. 1997). Defendant takes the position that Plaintiff's claim accrued when Plaintiff became aware that the 1986 Policies contained Asbestos Exclusions in 1987. Def.'s Cross-Mot. Mem. 32. Plaintiff, on the other hand, argues that the statute of limitations will not accrue until sometime after Defendant actually refuses to pay a claim for which payment is sought under the 1986 Policies. Pl.'s Summ. J. Reply 8.

Plaintiff's position relies primarily on Maryland case law dealing with cases in which insurers refused to defend or indemnify an insured for specific claims. For instance, in *Vigilant Ins. Co. v. Luppino*, 723 A.2d 14 (Md. 1999), Luppino referred a claim to his homeowner's insurer who responded in October 1990 with a letter denying coverage, defense, and indemnity with respect to the claims at issue. *Id.* at 485–86. Luppino defended the action at his own expense, resulting in a judgment against him which was upheld on appeal in September 1994. *Id.* While the appeal was pending, Luppino filed a complaint against his insurer in May 1994 for breach of the duty to defend and, after an amendment of the complaint, a breach of the duty to indemnify as well. *Id.* at 487.

In discussing whether Luppino's claims were timely, the Court of Appeals noted that "the duty to defend, by its very nature, is a continuing one that extends throughout the tort suit by the third party against the insured." *Id.* at 489 (citations omitted). Accordingly, "an insured would normally have three years *from the termination of the litigation* to sue the insurer for compensation for the legal services which the insured had been forced to pay for." *Id.* at 490 (emphasis added). Noting the disfavored nature of declaratory judgment actions to determine the breadth of insurance coverage, the Court of Appeals held that "the insured should not be prejudiced by his or her failure to seek a declaratory judgment prior to the trial of the underlying

12

tort suit. Consequently, limitations should not begin to run against the insured because the insured failed to bring a pre-tort trial declaratory judgment action." *Id.* at 494. That is to say, even though a dispute that could be resolved by bringing a declaratory judgment may exist for years before a suit finally is brought with respect to coverage for a particular claim, the statute of limitations does not begin to run until after a claim eventually is brought and is resolved, if ever.

In *Commercial Union Insurance Co. v. Porter Hayden Co.*, 698 A.2d 1167, the reasoning of *Luppino* was applied to a case that bears many similarities to this one. *Commercial Union* dealt with asbestos claims brought in and after 1978 under decades-old "occurrence" insurance policies purchased in the 1940s and 1950s. *Id.* at 1176. The Court of Special Appeals applied the reasoning of *Luppino* and held that, even though there was a period of many years during which the insured was aware of a dispute as to the proper interpretation of the insurance agreement and during which a declaratory judgment action may have been brought, the statute of limitations still had not begun to run until after the claim had been litigated to completion. *See id.* at 1191–93.

But the present case bears a crucial distinction from *Luppino* and *Commercial Union*, as here the disagreement goes to the *validity* of a policy provision, not its scope. And a careful examination of Maryland case law shows that Plaintiff's reliance on *Luppino* is misplaced. A more closely analogous case is *Jones v. Hyatt Ins. Agency, Inc.*, 741 A.2d 1099 (Md. 1999). *Jones* was a suit against an insurance agency for allegedly breaching a contract to obtain motor vehicle liability insurance for its client, leaving the client uninsured. *Id.* at 1100. In distinguishing *Luppino*, the Court of Appeals explained:

> In contrast [to claims based on the duty to defend or to indemnify], a contract to obtain insurance is ordinarily breached immediately upon the broker's failure to procure the insurance in a timely manner. The promise of the agent or broker is not to provide a defense or to pay a judgment. Instead, the promise is to obtain an

13

> insurance policy, and the breach occurs when the agent or broker does not timely obtain that policy. This breach cannot be cured after the insurance applicant commits a tort for which he or she rightfully believes that insurance coverage has been obtained. The consequence of the agent's failure to procure the insurance prior to the accidental tort is that the client will not be insured. There will be no insurer-furnished defense or indemnity.

*Id.* at 1104–05

Although it is agreed that AC&R had purchased an insurance policy from PMA, the nature of AC&R's claim—that Marsh and PMA had agreed to provide a policy offering certain coverage and, instead, provided a policy with less robust coverage—distinctly is similar to the claim asserted in *Jones*.

This reasoning also comports with the Court of Special Appeals holding in *Twelve Knots Partnership v. Fireman's Fund Insurance Co.*, 589 A.2d 105 (Md. Ct. Spec. App. 1991), where the insured was found to be bound by the terms of its policy even though they did not conform to the terms that the insured had expected in purchasing that policy.

> Where changes from the application appear in the delivered contract, . . . the insured has a duty to examine it promptly and notify the company immediately of his refusal to accept it. If such policy is accepted or is retained an unreasonable length of time, the insured is presumed to have ratified any changes therein and to have agreed to all its terms.

*Id.* at 113. As in *Twelve Knots*, there is no claim "that the defendants acted inconsistently with the actual policy language; indeed, it is clear that they acted in full accord with the policy provision. The alleged breach is that the policy was not in accord with the contract of purchase—what was delivered was not what was ordered . . . ." It is apparent that Maryland law distinguishes between claims based on the breaches of an existing policy and claims that go to the content or validity of the underlying policy itself. *See also Thelen v. Mass. Mut. Life Ins. Co.*, 111 F. Supp. 2d 688, 690 (D. Md. 2000) (holding that where plaintiff alleged that an insurance contract was entered into based upon fraudulent misrepresentations, the statute of

limitations began to run when the policy was delivered or, at latest, when the fraud became apparent).

Indeed, insofar as a statute of limitations, at root, is a tool "to assure fairness from defendants" by protecting them from claims "so stale as to be unjust," *Bertonazzi v. Hillman*, 216 A.2d 723, 726 (Md. 1966), this case clearly stands apart from *Luppino*. An insurance policy puts an insurer on notice that it may need to defend claims—or defend its denial of claims—for so long as the policy remains in existence. But an insurer can have no way to predict whether, decades down the line, an insured may draw into question the very process by which the insurance policy was entered into, and there is no reasonable way to prepare to defend such an action other than retaining forever an inordinate volume of records to show the insurer's conduct at the time each policy was issued. This also would put insurers at a significant disadvantage, as it would allow plaintiffs to keep a cause of action tucked away in their pocket—and maintain documentation to support their claim—with no notice or warning to an unwitting insurer who may be forced to defend its actions years later. Accordingly, it comports not only with Maryland case law, but also with fundamental principles of justice, fairness, and due process to hold that the statute of limitations began to run in 1987 when Shipe became aware of the Asbestos Exclusions or, at the absolute latest, in 1988 when PMA first asserted its rights under the Asbestos Exclusions. This action, commenced over twenty years later in 2012, is time-barred.

### B. Laches

Moreover, it appears that Plaintiff's claim—asserting that PMA and Marsh acted improperly in obtaining policies with Asbestos Exclusions and therefore that the Exclusions are invalid—seems to sound in a claim for reformation of the insurance contract. *See Jaguar Land Rover N. Am., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 650 (D. Md. 2010)

("Reformation is an equitable remedy that is only warranted when one of two circumstances exists: 'either there must be mutual mistake, or there must be fraud, duress, or inequitable conduct.'" (quoting *Md. Port Admin. v. John W. Brawner Contracting Co.*, 492 A.2d 281 (Md. 1985))). As a claim in equity, even if *Luppino*'s reasoning otherwise might apply, Plaintiff's claim still is barred by the equitable doctrine of laches. "In a purely equitable action, a lapse of time shorter than the period of limitations may be sufficient to invoke the doctrine; and, where the delay is of less duration than the statute of limitations, the defense of laches must include an unjustifiable delay and some prejudice to the defendant." *Parker v. Bd. of Election Supervisors*, 186 A.2d 195, 197 (Md. 1962).

"Laches is a defense in equity against stale claims; the word, itself, derives from the old French word for laxness or negligence." *Buxton v. Buxton*, 770 A.2d 152, 158 (Md. 2001). Even were the accrual of the limitations period unclear, it is apparent that equity demands that the doctrine of laches bar consideration of Plaintiff's claim. There is little doubt that Plaintiff was aware that the 1986 Policies, as issued, contained the Asbestos Exclusions. Cameron Dep. 61:17 – 64:11. And in any event, PMA's position that it would not be defending Asbestos Suits under the 1986 Policies was made abundantly clear by at least two letters sent in 1988 and 1990. Letter from PMA to AC&R 2 (Sept. 8, 1988); Letter from PMA to AC&R 2 (May 7, 1990). Accordingly, Plaintiff clearly had "'knowledge, or the means of knowledge, of the facts which created [its] cause of action.'" *Buxton*, 770 A.2d at 159.

Yet AC&R has provided no explanation as to why it did not bring an action previously. The parties' positions were staked out and AC&R was aware that Asbestos Suits created considerable exposure long ago. Shipe Dep. 80:18–22, Stip. Ex. 20, ECF No. 33-20. AC&R's only defense is that "there was simply nothing [Shipe] could do about [the Asbestos

Exclusions]." Pl.'s Reply Mem. 8. This does not explain why AC&R's view has changed in the last twenty-five years, or why it should be excused for not seeking relief—even if it thought its odds of success were slim—at that time.

In contrast, Plaintiff's delay has prejudiced Defendant. "'What amounts to "prejudice," such as will bar the right to assert a claim after the passage of time, depends upon the facts and circumstances of each case, but generally is held to be anything that places him in a less favorable position.'" *Id.* at 159 (quoting *Parker*, 186 A.2d at 197). It is hard to imagine greater prejudice to Defendant than the complete loss of any evidence that it might have presented on its own behalf. Virtually every potential witness with personal knowledge regarding the negotiations over the insurance policy either is dead or has no recollection of the events of 1986–1987. Kerns Aff. ¶ 3–14. The documentary record also has been decimated by the passage of time: PMA has acknowledged that it destroyed any documents relating to the negotiations over the 1986 policy years ago, Hamilton-Little Aff. ¶ 10,[6] and Marsh no longer has any relevant documents either, Stip. ¶ 51. The only evidence that PMA has been able to present to show its actions with respect to the 1986 Policies is the affidavit of Susan Guinn, a PMA customer representative who acknowledged that she "cannot recall AC&R . . . specifically" and testified only to her general practice, Guinn Aff. ¶ 3, Def.'s Cross-Mot. Mem. Ex. B, ECF No. 38-4, and the affidavit of Deborah Conley regarding Asbestos Exclusions generally, Conley Aff., Def.'s

---

[6] Were there any evidence in the record to show that AC&R so much as had threatened legal action before the destruction of those documents, it might be sufficient to find that PMA acted improperly in destroying its documents and was not prejudiced by the passage of time. *See Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 524 (D. Md. 2010) ("It generally is recognized that when a company or organization has a document retention or destruction policy, it 'is obligated to suspend' that policy and 'implement a "litigation hold" to ensure the preservation of relevant documents' *once the preservation duty has been triggered.*" (citation omitted) (emphasis added)). Because the duty to retain documents did not arise for PMA until after their destruction, it cannot be penalized for following its records retention policy.

Cross-Mot. Mem. Ex. A, ECF No. 38-3. Further, the record does not reflect any direct communications between AC&R and PMA. *See* Cameron Dep. 12:7–11. The only party to have retained a significant volume of records appears to be AC&R, whose files did not appear to contain any relevant documents written by or on behalf of AC&R or its employees, *see id.* at 11:2 – 13:10, and whose motivations in keeping those documents, while perhaps not improper, nevertheless were not those of a disinterested observer. And Defendant has presented expert opinion testimony as to the type of information that typically would be reflected in the files of an insurer or an insurance broker, to demonstrate that it is likely that relevant evidence has been lost. *See* Gagan Aff. 3–4, 10–13, Def.'s Cross-Mot. Mem. Ex. D, ECF No. 38-6. In short, because of the passage of time, Defendant has not been able to put forward any of its own evidence to controvert Plaintiff's case. This is substantial prejudice.

Assuming that Plaintiff has shown evidence of improper conduct with respect to the 1986 Policies, the passage of time also has rendered it impossible to show whose fault any error may have been—PMA's or Marsh's. Defendant's expert has opined that, in typical cases, an insurance broker would be expected to discuss a term such as the Asbestos Exclusions with an insured. Muhl Aff. ¶ 10, Def.'s Cross.-Mot. Mem. Ex. C, ECF No. 38-5. And the excerpts provided from the deposition of Peter J. Hildebrand suggest possible breaches of duty by Marsh. *See generally* Hildebrand Decl., Pl.'s Summ. J. Mot. Ex. 14, ECF No. 35-14. But the statute of limitations long has run on any malpractice by Marsh, making it difficult, if not impossible, to suss out who is responsible for any alleged misconduct.

It is a well-settled maxim that "equity aids the vigilant, not those who sleep on their rights." *Lyons P'ship L.P. v. Morris Costumes, Inc.*, 243 F.3d 789 (4th Cir. 2001). The time for AC&R to seek to clarify whether the Asbestos Exclusions were enforceable was in 1987, when

Shipe became aware of the Exclusions, or at the absolute latest, in 1988 when PMA expressly asserted its rights under the Asbestos Exclusions. Pl.'s Reply 7. AC&R did not file a suit at that time and the record does not show that AC&R ever even stated that it believed the Asbestos Exclusions were not enforceable. To the contrary, AC&R continued to purchase insurance policies from PMA notwithstanding that they all contained Asbestos Exclusions. On the record before me, it is possible (though by no means clear) that the Asbestos Exclusions may have been added to the insurance policies in contravention of a preexisting agreement as to the nature of the policies that AC&R was purchasing. But that does not mean that AC&R was permitted to sit on those rights for twenty-five years until, after the death of the officer who negotiated the 1986 Policies in the first instance, AC&R's new management determined that it would be helpful to invalidate a quarter-century-old policy exclusion. Even if there were a question as to whether the statute of limitations operates to bar Plaintiff's decades-old claim, it is clear that, under these facts, the doctrine of laches certainly does.

### C. Remaining Issues

The parties have raised a number of issues with respect to the merits of AC&R's and PMA's respective claims. Because AC&R's claim is time-barred, because the evidence on either side contains numerous gaps, and because a ruling on the merits would require me to resolve complicated issues of Maryland state insurance law on an incomplete factual record, I decline to opine on the merits of Plaintiff's time-barred claims. Because PMA has prevailed, there also is no need to determine whether AC&R is entitled to attorney's fees. *See* Pl.'s Summ. J. Mem. 26.

AC&R also has sought to amend its Complaint to add several factual allegations. Because the facts presented by both parties at summary judgment may be relevant to whether an amendment is prejudicial or merely conforms the pleadings to the issues that are alive in the

case, it was necessary to dispose of summary judgment prior to ruling on the motion to amend. But although Rule 15 requires me to grant amendment "freely" where justice so requires, Fed. R. Civ. P. 15(a)(2), amendments to the complaint should not be permitted where they would be futile. *HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001). The allegations in AC&R's proposed Second Amended Complaint do not alter the applicability of the statute of limitations or of laches, and therefore AC&R's amendment would not act to save its claims. Accordingly, AC&R's motion for leave to amend is futile and will be DENIED.

## IV. CONCLUSION

For the aforementioned reasons:

(A) AC&R's Motion for Leave to File Second Amended Complaint, ECF No. 27, is DENIED

(B) AC&R's Motion for Summary Judgment, ECF No. 34, is DENIED;

(C) PMA's Cross-Motion for Summary Judgment, ECF No. 38 is GRANTED;

(D) The Clerk SHALL ENTER JUDGMENT in favor of PMA on all pending counts; and

(E) The Clerk is ordered to CLOSE this case.

A separate order shall issue.

Dated: <u>January 24, 2014</u>              /S/
                                   Paul W. Grimm
                                   United States District Judge

dsy